IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAUREEN PIZZI, *et al*,<br><br>    Plaintiffs,<br><br>  v.<br><br>ELI LILLY AND COMPANY, *et al*.<br><br>    Defendants. | CIVIL ACTION No. 1:05-cv-01648-RBW |

## DEFENDANT ELI LILLY AND COMPANY'S
## MOTION FOR SUMMARY JUDGMENT

Eli Lilly and Company ("Lilly") moves for Summary Judgment on all claims asserted against it by Plaintiffs Maureen Pizzi and Kathleen Mahoney ("Plaintiffs") because their claims are time-barred. In support of its motion, Lilly adopts and incorporates herein its accompanying Memorandum of Points and Authorities (including its Statement of Undisputed Facts) and the Affidavit of Lynn M. Zuchowski.

WHEREFORE, Lilly respectfully requests that judgment be entered in its favor on all counts.

## REQUEST FOR HEARING

Pursuant to LCvR 7.1(f), Lilly requests a hearing on its Motion for Summary Judgment.

Respectfully submitted,

ELI LILLY AND COMPANY

/s/ James J. Dillon
James J. Dillon
D.C. Bar No. 485593
Foley Hoag LLP
155 Seaport Boulevard
World Trade Center West
Boston, MA 02210-2600
(617) 832-1000

Dated:  October 27, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAUREEN PIZZI, *et al*,<br><br>           Plaintiffs,<br><br>      v.<br><br>ELI LILLY AND COMPANY, *et al.*<br><br>           Defendants. | CIVIL ACTION No. 1:05-cv-01648-RBW |

**DEFENDANT ELI LILLY AND COMPANY'S
MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Eli Lilly and Company ("Lilly") moves for summary judgment under Fed. R.

Civ. P. 56 on all claims asserted by Plaintiffs Maureen Pizzi ("Ms. Pizzi") and Kathleen

Mahoney ("Ms. Mahoney") (collectively "Plaintiffs"). Plaintiffs' claims are barred by District of

Columbia statute of limitations because Ms. Pizzi and Ms. Mahoney were on notice of their

claims more than three years before filing suit.

WHEREFORE, Lilly respectfully requests that judgment be granted in its favor.

**STATEMENT OF UNDISPUTED FACTS RELATED
TO PLAINTIFF MAUREEN PIZZI[1]**

1.      Ms. Pizzi has asserted claims sounding in negligence, strict liability, breach of

warranty, misrepresentation and for punitive damages. *See* Complaint (a true copy of which is

attached hereto as Exhibit ("Ex.") 1 to the Affidavit of Lynn M. Zuchowski ("Zuchowski Aff.").

She commenced this suit on July 28, 2005. Complaint (Zuchowski Aff., Ex. 1).

---

[1] Lilly accepts these facts as undisputed for purposes of this summary judgment motion only and reserves the right
to contest any of these facts at trial.

2.     Ms. Pizzi's mother, Katherine O'Donnell ("Ms. O'Donnell"), became pregnant

with her around April 1961, while she was living in Weymouth, Massachusetts.  Plaintiff

Maureen A. Pizzi's Responses to Defendant' Amended Uniform Preliminary Requests for

Information ("Pizzi UPRI") Nos. 1, 4 (copy attached as Ex. 2 to Zuchowski Aff.).  While she

was pregnant with Ms. Pizzi, Ms. O'Donnell was treated by Drs. Carey and McKeogh located at

Quincy, OB-GYN in Quincy, Massachusetts.  Pizzi UPRI No. 12 (Zuchowski Aff., Ex. 2).

3.     Ms. Pizzi alleges that her mother took diethylstilbestrol ("DES") during her

pregnancy with her.  Complaint at ¶ 3 (Zuchowski Aff., Ex. 1).

4.     Plaintiff has known of her alleged DES exposure since the mid-1970s.  Pizzi

UPRI No. 27 (Zuchowski Aff., Ex. 2); Deposition Transcript of Maureen A. Pizzi (copies

attached as Ex. 3 to Zuchowski Affidavit) ("Pizzi Dep.") at 16-17; 47-48.  Ms. Pizzi learned of

this exposure while she and Ms. O'Donnell were at Ms. Pizzi's pediatrician's office.  *Id.* at 16.

Ms. Pizzi recalls discussing the possible risk of cancer with her pediatrician, Dr. Tardiff, and he

said that he would get her on regular OB/GYN treatment to monitor her.  *Id.* at 17.  Thereafter,

Ms. Pizzi consistently disclosed her DES exposure to her physicians.  *Id.* at 27-28, 30.

5.     Ms. Pizzi and her husband, Scott Pizzi ("Mr. Pizzi") were married on July 14,

1984.  Pizzi UPRI No. 51 (Zuchowski Aff., Ex. 2).  Ms. Pizzi and Mr. Pizzi stopped using birth

control, in an attempt to get pregnant, approximately six months after they were married.  Pizzi

Dep. at 26-27.  (Zuchowski Aff., Ex. 3).  They have not used birth control since that time.  *Id.*

6.     In 1986, Ms. Pizzi met with Dr. Bernard Spiegel to discuss her problem

conceiving after approximately one year of trying unsuccessfully to become pregnant.  Pizzi

Dep. at 27.  (Zuchowski Aff., Ex. 3).  On November 20, 1986, Dr. Spiegel performed a D&C and

laparoscopy on Ms. Pizzi, noted in the medical records the presence of a T-shaped uterus, and

diagnosed her with primary infertility and a very small cavity. *See* November 20, 1986 medical

record (excerpts attached as Ex. 4 to Zuchowski Aff.).

7.      On December 1, 1987, Ms. Pizzi underwent a D&C and laparoscopy at Dr.

Berger's request. In his medical records, Dr. Berger noted "the cervix was slightly abnormal due

to an impartial hood typical of DES exposure." *See* December 1, 1987 medical record (attached

as Ex. 5 to Zuchowski Aff.). On December 3, 1987, Dr. Berger sent a letter to Dr. Spiegel to

report the results of Ms. Pizzi's diagnostic tests. He noted that the uterotubogram "revealed a

moderate 'T' shaped uterus typical of DES exposure…" He also noted the presence of "slightly

'withered tubes' … which I have seen occasionally in DES." He continued "*I am putting the*

*whole culprit here on DES exposure in that I have seen 50-100 primarily infertile DES exposed*

*women in whom no other cause is noted*." *See* December 2, 1987 letter (attached as Ex. 6 to

Zuchowski Aff.) (emphasis added).

8.      On October 5, 1990, Dr. Berger sent her a letter enclosing all of her medical

records so she could bring them to another fertility specialist, Dr. Crane. *See* October 2, 1990

letter from Ms. Pizzi to Dr. Berger's Secretary and October 5, 1990 letter from Dr. Berger to Ms.

Pizzi (attached as Ex. 7 to Zuchowski Aff.). Ms. Pizzi received the medical records from Dr.

Berger but claims that she never saw the letter and never looked at the medical records, noting

she was not curious about what they said. Pizzi Dep. at 39-41. (Zuchowski Aff., Ex. 3).

9.      Dr. Berger testified that he would always go talk to his patients after he performed

a diagnostic procedure, such as the diagnostic laparoscopy that he performed on Ms. Pizzi on

December 1, 1987. See Transcript of the Deposition of Merle J. Berger, M.D. ("Berger Dep.") at

33 (excerpts attached as Ex. 8 to Zuchowski Aff.). Had Ms. Pizzi asked Dr. Berger what caused

her infertility, he most likely would have told her that DES was the cause. Berger Dep. at 37-39.
*Id.*

10.     In January, 1993, Ms. Pizzi went to see Dr. Adelina Emmi to resume her

infertility evaluation. *See* January 20, 1993 Medical Record (attached as Ex. 9 to Zuchowski

Aff.). At that visit, Ms. Pizzi and Dr. Emmi discussed Ms. Pizzi's plan to start intrauterine

insemination ("IUI") and then return to discuss assisted reproductive techniques in vitro

fertilization ("IVF") and gamete intrafallopian transfer ("GIFT"). *Id.* In her medical record, Dr.

Emmi noted that Ms. Pizzi understands the risks and complications of ovulation induction ("OI")

and the risks that are associated with DES exposure, i.e., pregnancy loss, cervical incompetence

and a small cavity with multiple gestations. *Id.*

## STATEMENT OF UNDISPUTED FACTS RELATED
## TO PLAINTIFF KATHLEEN MAHONEY

11.     Ms. Mahoney has asserted claims sounding in negligence, strict liability, breach

of warranty, misrepresentation and for punitive damages. *See* Complaint (Zuchowski Aff., Ex.

1). She commenced this suit on July 28, 2005. *Id.*

12.     Ms. Mahoney's mother, Ms. O'Donnell, became pregnant with her in

approximately February 1965, while she was living in Weymouth, Massachusetts. Plaintiff

Kathleen Mahoney's Responses to Defendant' Amended Uniform Preliminary Requests for

Information ("Mahoney UPRI") Nos. 1, 4 (copy attached as Ex. 10 to Zuchowski Aff.). While

she was pregnant with Ms. Mahoney, Ms. O'Donnell was treated by Drs. Carey, McKeogh and

Sullivan located at Quincy, OB-GYN in Quincy, Massachusetts. Mahoney UPRI No. 12

(Zuchowski Aff., Ex. 10).

13.     Ms. Mahoney alleges that her mother took diethylstilbestrol ("DES") during her

pregnancy with her. Complaint at ¶ 3 (Zuchowski Aff., Ex. 1).

14.     Ms. Mahoney learned of her exposure to DES in approximately 1983, when she was seventeen years old. *See* Deposition Transcript of Kathleen Mahoney ("Mahoney Dep.") at 20-21 (excerpts attached as Ex. 11 to Zuchowski Aff.). Ms. Mahoney testified that she received her first pelvic exam and pap smear from Dr. Spiegel when she was seventeen after Ms. O'Donnell informed Dr. Spiegel that she had taken DES during her pregnancy with Ms. Mahoney. *Id.* at 40-41. Ms. Mahoney testified that thereafter, she continuously notified her gynecologists about her DES exposure. *Id.* at 45, 57. Ms. Mahoney married Michael Mahoney on March 19, 1994. *See* Mahoney Dep. at 10 (Zuchowski Aff., Ex. 11).

15.     On July 28, 1994, Ms. Mahoney discussed her infertility with Dr. Paul Keough. *See* July 28, 1994 medical record (attached as Ex. 12 to Zuchowski Aff.). In this medical record, Dr. Keough noted that Ms. Mahoney had not been using birth control for five years and had been trying for one year to get pregnant. *Id.* Dr. Keough noted that Ms. Mahoney's "sister also had DES exposure and in Boston under treatment for infertility." *Id.* After a pelvic exam that day, Dr. Keough noted that Ms. Mahoney "has few adhesions from cervix (from DES) and DES like cervix." *Id.* Ms. Mahoney testified that she recalled discussing a possible link between DES and infertility with Dr. Keough, but said that Dr. Keough told her the infertility could be caused by endometriosis, cysts and painful menstrual cycles. Mahoney Dep. at 58-59 (Zuchowski Aff., Ex. 11).

16.     In 1999, Ms. Mahoney sought the advice of fertility specialist Dr. Richard Reindollar. Ms. Mahoney underwent a hysterosalpingogram ("HSG") on April 27, 1999. *See* April 27, 1999 medical record (attached as Ex. 13 to Zuchowski Aff.). Dr. Reindollar diagnosed Ms. Mahoney with a T-shaped uterus and abnormal cervix after that procedure. *Id. See also*

Deposition Transcript of Richard H. Reindollar ("Reindollar Dep.") at 40 (attached as Ex. 14 to Zuchowski Aff.)

17.    Dr. Reindollar testified that he generally spends a lot of time speaking with patients regarding their diagnoses and that he is often late in his patient schedule as a result. Reindollar Dep. at 43 (Zuchowski Aff., Ex. 14).  With regard to whether Dr. Reindollar discussed Ms. Mahoney's HSG diagnosis of a T-shaped uterus and abnormal cervix, that he believed were related to DES, with Ms. Mahoney, Dr. Reindollar testified "if I saw a T-shaped uterus with a cervix as abnormal as hers I would have discussed it."  Reindollar Dep. at 44 (Zuchowski Aff., Ex. 14).

18.    In 1999, Ms. Mahoney underwent several rounds of intrauterine insemination, in an attempt to get pregnant.  Mahoney Dep. at 73 (Zuchowski Aff., Ex. 11).  Dr. Reindollar noted in a medical record that Ms. Mahoney "understands risk of DES with twins.  Needs surveillance for incompetent cervix."  See December 2, 1999 medical record (attached as Ex. 15 to Zuchowski Aff.).  Dr. Reindollar sent a letter to Dr. Keough stating "you know Kathleen has been exposed to or has been DES exposed.  Her hysterosalpingogram did demonstrate a T-shaped uterus but with a reasonable cavity.  As you know her cervix is abnormal and I have suggested that when she does become pregnant she will need to have surveillance for an incompetent cervix."  See January 20, 2000 letter from Dr. Reindollar to Dr. Keough (copy attached as Ex. 16 to Zuchowski Aff.).

## STATEMENT OF UNDISPUTED FACTS RELATED
## TO BOTH PLAINTIFFS, MAUREEN PIZZI AND KATHLEEN MAHONEY

19.    Information about the injuries allegedly caused by *in utero* exposure to DES and DES litigation is widely available on the Internet through common search engines such as

Yahoo! and Google. *See* Excerpts of Search Results concerning DES and infertility (attached as Ex. 17 to Zuchowski Aff).

20.    Ms. Pizzi and Ms. Mahoney both have internet access at their homes. Pizzi Dep. at 126 (Zuchowski Aff., Ex. 3); Mahoney Dep. at 101 (Zuchowski Aff., Ex. 11). Both plaintiffs maintain that they have not used the internet to research DES. Pizzi Dep. at 126 (Zuchowski Aff., Ex. 2); Mahoney Dep. at 101-102 (Zuchowski Aff., Ex. 11).

21.    Ms. Pizzi testified that she was generally aware of product liability suits, including asbestos litigations. Pizzi Dep. at 126-27 (Zuchowski Aff., Ex. 3).

22.    Information from DES Action, a support group for women exposed to DES, also had information regarding causation available on the Internet as early as 1996. *See* list of archived Internet pages (attached as Ex. 18 to Zuchowski Aff.). This site asserted, at least as early as April, 1999 that infertility was more frequent in "DES daughters" than in the population at large. *See* search results from archived pages of www.desaction.org (Zuchowski Aff., Ex. 18). At least as early as April, 1999, this website also reported on DES litigation and provided attorney referrals for DES-exposed women. *See* search results from archived pages of www.desaction.org (Zuchowski Aff., Ex. 18).

23.    In 1991, the Time Magazine cover story discussed DES exposure in the context of the possible causes of infertility. "Making Babies: More than a million couples seek treatment for infertility each year," September 30, 1991 at page 1-2 (attached as Ex. 19 to Zuchowski Aff.). A 1991 USA Today article also mentioned DES exposure in connection with miscarriages and other reproductive difficulties. "Women, DES and Decades of Desolation," November 25, 1991 at page 1 (attached as Ex. 20 to Zuchowski Aff.).

24.    The Boston Globe published at least several articles and editorials in the 1990's

discussing the impact of diethylstilbestrol exposure on fertility. *E.g.,* Julie Kimball, *Quilt,*

*Dreams Weave A New Story*, BOSTON GLOBE, February 8, 1999 (attached as Ex. 21 to

Zuchowski Aff.); Nathan Cobb, *A Net Gain For Motherhood - Hopeful Parents Using Web To*

*Locate A Surrogate Mom*, BOSTON GLOBE, June 1, 1998 (attached as Ex. 22 to Zuchowski Aff.);

*Ask Your Mother*, BOSTON GLOBE, June 11, 1995 (attached as Ex. 23 to Zuchowski Aff.); *see*

*also* Beverly Beckham, *Op-Ed, Still Learning From DES Flaws*, BOSTON HERALD, Jan. 17, 1996

(attached as Ex. 24 to Zuchowski Aff.).

25.    By 1977, and thereafter, medical literature had noted associations between DES

exposure and infertility. *See* Kaufman, *et al.*, "Upper Genital Tract Changes Associated with

Exposure In Utero to Diethylstilbestrol," 128 *Am. J. Obstet. Gynecol.* 51 (May 1, 1977); *see also*,

Excerpts of Search Results from www.pubmed.gov (attached as Ex. 25 to Zuchowski Aff.).

26.    Information on legal claims alleging negligence by makers of DES is also widely

available on the Internet and in popular news sources.  Numerous lawsuits against DES

manufacturers were filed in the 1970s, 1980s, 1990s, and 2000s concerning injuries allegedly

caused by *in utero* exposure to DES, and the results of these lawsuits were reported in the

popular press. *See, e.g.*, Indices of Popular Literature (attached as Ex. 26 to Zuchowski Aff.);

Westlaw search of Massachusetts media sources concerning diethylstilbestrol (attached as Ex. 27

to Zuchowski Aff.).  In Massachusetts, where Plaintiffs have lived their entire lives, a putative

class action was filed in 1976. *Payton v. Abbott Labs.*, 437 N.E.2d 171, 173 (Mass. 1982).

27.    As example only, the Boston Globe published a story in 1994 about a group of

women that were awarded $42.3 million due to cancer and reproductive problems allegedly

related to DES.  11 Get $42.3M In DES Lawsuit, BOSTON GLOBE, January 9, 1994 (attached as

Ex. 28 to Zuchowski Aff.). The Boston Herald newspaper reported the same information. News

In Brief, *DES Women Awarded $42.3M*, Boston Herald, Jan. 9, 1994 (attached as Ex. 29 to

Zuchowski Aff.).

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c); *Carroll v. Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir.

2002). Once the moving party has made a showing that no genuine issue of material fact exists,

the burden shifts to the non-moving party to come forward with "specific evidence that

sufficiently contradicts or undermines the movant's case to demonstrate a material factual

dispute." *United Mine Workers of Am. v. Pittston Co.*, 984 F.2d 469, 473, 299 U.S. App. D.C.

339 (D.C. Cir. 1993); *see also Carroll*, 294 F.3d at 236. In meeting its burden, the non-moving

party "must do more than simply show that there is some metaphysical doubt as to the material

facts." *Bias v. Advantage Int'l, Inc.*, 905 F.2d 1558, 1561, 284 U.S. App. D.C. 391 (D.C. Cir.

1990) (quoting *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Instead, the evidence submitted must be such that a reasonable jury could find for the non-

moving party. *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 492, 330 U.S. App. D.C. 39

(D.C. Cir. 1998). "Where the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party, there is no genuine issue for trial" and the court must grant

summary judgment for the moving party. *Brees v. Hampton*, 877 F.2d 111, 117, 278 U.S. App.

D.C. 176 (D.C. Cir. 1989) (quoting *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986)).

## II.   PLAINTIFFS CLAIMS ARE BARRED BY THE DISTRICT OF COLUMBIA STATUTE OF LIMITATIONS

Lilly is entitled to summary judgment, because Plaintiffs' claims are time barred. Plaintiffs commenced this suit in the District of Columbia, thus, the District of Columbia's procedural law applies.  In the District of Columbia, product liability claims are governed by a three-year statute of limitations.  D.C. Code § 12-301(8) (2001); *Smith v. Brown & Williamson Tobacco Corp.*, 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998).  Plaintiffs filed this lawsuit on July 28, 2003.  Complaint (Zuchowski Aff., Ex. 1).  Accordingly, if Plaintiffs' cause of action arose any time prior to July 28, 2000, their claims are time-barred under the District's statute.  In products liability cases, the District of Columbia applies a three pronged "discovery rule" where, like here, "the relationship between the fact of injury and the alleged tortious conduct is obscure." *Brin v. S.E.W. Investors*, 902 A.2d 784, 792 (D.C. App. 2006) (quoting *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 945 (D.C. 2003)).  Under this rule, a plaintiff's claims accrue when the plaintiff "know[s], *or by the exercise of reasonable diligence should know* (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing." *Bussineau v. President & Dir. of Georgetown Coll.*, 518 A. 2d 423, 435 (D.C. 1986) (emphasis added).

This is not a case where the time of accrual under the discovery rule is a disputed question of fact.  Lilly bases its arguments on Plaintiffs' own testimony and the testimony of their experts.  With regard to Ms. Pizzi's infertility, her own doctor placed "the whole culprit here on DES exposure" back in 1987.  See December 2, 1987 Letter (Zuchowski Aff., Ex. 6).  In addition, Ms. Mahoney testified that she discussed the possible link of her infertility and DES exposure with her doctor in 1994.  In both of these situations, DES became a plausible cause of their injuries in 1987 and 1994 respectively, thereby putting the Plaintiffs on inquiry notice.

The evidence establishes that Plaintiffs' causes of action accrued well before July, 2000. Ms. Pizzi's medical records contained diagnoses with a T-shaped uterus, distorted cervix and withered tubes and primary infertility by 1987. *See* Medical Records and associated correspondence (Zuchowski Aff., Ex. 4, 5 and 6). There is also no question that had Ms. Pizzi *merely asked* her fertility specialist what caused her injuries, he would have told her that he believed DES was the cause. Berger Dep. at 37-39 (Zuchowski Aff., Ex. 8). In 1990, Ms. Pizzi even received all of her medical records from her fertility specialist that outlined her DES related injuries, but she chose not to read them. See October 1990 letters (Zuchowski Aff., Ex. 7). In 1993, Ms. Pizzi discussed DES related fertility risks including pregnancy loss, cervical incompetence and a small cavity with multiple gestations with one of her physicians, Dr. Emmi, further putting her on inquiry notice that DES was a plausible cause of her infertility. *See* January 20, 1993 Medical Record (Zuchowski Aff., Ex. 9).

Ms. Mahoney was put on inquiry notice that her *in utero* DES exposure was a plausible cause of her infertility in 1994 when she discussed the possible linkage with Dr. Keough. *See* July 28, 1994 Medical Record (Zuchowski Aff., Ex. 12); Mahoney Dep. at 58-59 (Zuchowski Aff., Ex. 11). By January 2000, Ms. Mahoney's medical records contained diagnoses of infertility, an abnormal cervix and a T-shaped uterus. Mahoney Medical Records (Zuchowski Aff., Ex. 12, 13). When asked if he would have told her that her [1999 diagnoses of a] T-shaped uterus and abnormal cervix were related to Ms. Mahoney's *in utero* DES exposure, Plaintiff's fertility expert Dr. Reindollar stated "if I saw a T-shaped uterus with a cervix as abnormal as hers I would have discussed it." Reindollar Dep. at 44 (Zuchowski Aff., Ex. 14). Finally, had either Plaintiff engaged in *any bit* of research about DES, they would have learned of allegations of

wrongdoing against the manufacturers of DES. *See generally* Statement of Undisputed Facts, ¶¶ 19-27.

**A.     Prong 1:  Plaintiffs Knew Of Their Injuries More Than Three Years Before Filing Suit**

Ms. Pizzi claims that DES caused her T-shaped uterus, distorted cervix, withered tubes and primary infertility.  Pizzi UPRI  No. 28 (Zuchowski Aff., Ex. 2).  All of these injuries were diagnosed by 1987.  *See* Medical Records and associated correspondence  (Zuchowski Aff., Ex. 4, 5, 6 and 7).  Ms. Mahoney claims that DES caused her  T-shaped uterus, abnormal cervix, infertility and two pregnancy losses.  Mahoney UPRI No. 28 (Zuchowski Aff., Ex. 10).  All of these injuries, with the exception of one pregnancy loss, were diagnosed, or occurred by April, 2000.  *See* Mahoney Medical Records and Reindollar Dep. at 44 (Zuchowski Aff., Ex. 12, 13, 14).  Because Plaintiffs knew of these claimed injuries prior to July, 2000, the first prong of the District of Columbia discovery rule is satisfied.  *Bussineau*, 518 A. 2d at 435 (D.C. 1986).

**B.     Prong 2:  Plaintiff Had A Duty To Investigate The Cause Of Her Injuries**

Under District of Columbia law, plaintiffs have an affirmative duty to act reasonably and diligently in determining whether or not they have a cause of action.  *Diamond v. Davis*, 680 A. 2d 364, 372, 381 (D.C. 1996).  If a reasonable investigation would have led to actual notice, a plaintiff is deemed to be on inquiry notice of her claim.  *Id.* at 372.  This duty applies to all three prongs of the discovery rule.  *Bussineau*, 518 A. 2d at 435.  "The discovery rule does not . . . give the plaintiff *carte blanche* to defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm."  *Hendel v. World Plan Exec. Council*, 705 A. 2d 656, 661 (D.C. 1997).  Plaintiffs have failed to satisfy their

duty to investigate as a matter of law. Because a reasonable investigation would have led to actual notice, Plaintiffs should be charged with inquiry notice of their claims.[2]

Ms. Pizzi has known since the mid-1970s that she had been exposed *in utero* to DES. Pizzi UPRI (Zuchowski Aff., Ex. 2). She was diagnosed by 1987 with infertility, uterine abnormalities and an abnormal cervix. *See* Pizzi Medical Records and associated correspondence (Zuchowski Aff., Ex. 4, 5, 6 and 7). Ms. Mahoney learned that she had been exposed *in utero* to DES in approximately 1983. Mahoney Dep. at 20-21 (Zuchowski Aff., Ex. 11). By April, 2000, Ms. Mahoney had been diagnosed with a T-shaped uterus, abnormal cervix, infertility and had suffered one pregnancy loss. Mahoney Medical Records and associated correspondence (Zuchowski Aff., Ex. 12, 13, 15 and 16). Despite this knowledge, Plaintiffs maintain that they have never performed any research into what effect their exposure to DES might have had. Pizzi Dep. at 126 (Zuchowski Aff., Ex. 3); Mahoney Dep. at 101-102 (Zuchowski Aff., Ex. 11). Had Plaintiffs performed the most *minimal* investigation, they would have learned of a possible causal link between her DES exposure and their claimed injuries. Thus, they should be charged with inquiry notice of their claims. *Diamond*, 680 A. 2d at 372.

        1.    <u>Dr. Berger Would Have Told Ms. Pizzi That He Believed Her Injuries Were Caused By DES Exposure</u>

Dr. Berger, Ms. Pizzi's fertility specialist from 1987 to 1989 and a long-time plaintiffs expert in DES cases, testified that he most likely would have told Plaintiff that he believed her

---

[2] Plaintiffs will no doubt rely on *Brin v. S.E.W. Investors*, 902 A.2d 784 (D.C. App. 2006) to argue that Plaintiffs' claims are not barred by the District of Columbia's statute of limitations. Lilly maintains that Plaintiffs' reliance on *Brin* will be misplaced, however, because this case is distinguishable on the facts. *See id.* Unlike the record here in which the Plaintiffs' physicians linked the Plaintiffs' injuries to their *in utero* DES exposure, the Plaintiff in *Brin* visited numerous physicians who were unable to determine the plausible cause of plaintiff's injuries. *See id. at* 789. Ultimately, the court determined that the record was not clear enough to justify a grant of summary judgment on the statute of limitations grounds. *See id.* at 802. Here, however, both Plaintiffs' physicians are their testifying experts. These experts had the same views in 1994 (Pizzi) and 1999 (Mahoney) as they do now. Merely asking their own doctors was all that was necessary.

injuries were caused by DES had she only asked him. Berger Depo. at 37-39 (Zuchowski Aff.,

Ex. 8); *see also* December 2, 1987 letter from Dr. Berger to Dr. Spiegel (Zuchowski Aff., Ex. 6)

(putting the "whole culprit" of Ms. Pizzi's fertility problems on DES). But, Ms. Pizzi states she

never asked this very simple question, despite protestations that she did and still does want to

conceive a biological child. A reasonable person who was trying to become pregnant, who

underwent a variety of infertility tests and procedures, would have made this inquiry of her

doctors. Had Ms. Pizzi merely asked Dr. Berger what he believed the cause of her injuries to be,

back in 1987, she would have learned that his answer was, "DES." In addition, Ms. Pizzi's

January 1993 conversation with Dr. Emmi linking DES exposure to potential fertility problems

including pregnancy loss, an incompetent cervix and a small uterine cavity, put Ms. Pizzi on

further notice that DES was a plausible cause of her infertility. *See* January 20, 1993 Medical

Record (Zuchowski Aff., Ex. 9).

> 2.    Ms. Mahoney Discussed a Possible Link Between DES Exposure With Dr.
>       Keough and Infertility and Dr. Reindollar Would have Told Her That Her Injuries
>       Were Caused by DES Exposure.

In her deposition, Ms. Mahoney admitted that she discussed the possible linkage between

DES and infertility with Dr. Keough back in 1994. Mahoney Dep. at 58-59 (Zuchowski Aff.,

Ex. 11). In addition, Dr. Reindollar, Ms. Mahoney's fertility specialist from 1999 to 2000,

testified that given her T-shaped uterus and cervix "as abnormal as hers," he would have

discussed the fact that he thought they were related to her DES exposure. Reindollar Dep. at 44

(Zuchowski Aff., Ex. 14). Even if Dr. Reindollar did not discuss this with her, any reasonable

person who was trying to become pregnant and who was undergoing an array of infertility tests,

after learning years before of a potential linkage between DES and infertility, would have made

this inquiry of her fertility doctors. If Ms. Mahoney asked Dr. Reindollar what he believed the

cause of her injuries to be, back in 1999 and January of 2000, she would have learned that his answer was also "DES."

3.    The Internet And Other Information Sources Would Have Revealed To Plaintiffs That DES Could Have Caused Their Injuries

Plaintiffs also had numerous other resources available to them, had they made any effort to inquire into the possible cause of their injuries. Numerous articles on the alleged connection between DES and infertility have appeared in The Boston Globe and other Massachusetts news sources over the years. As example only, The Boston Globe published at least several articles and editorials in the 1990's discussing the impact of diethylstilbestrol exposure on fertility. *E.g.,* Julie Kimball, Quilt, Dreams Weave A New Story, BOSTON GLOBE, February 8, 1999 (Zuchowski Aff., Exhibit 21); Nathan Cobb, A Net Gain For Motherhood - Hopeful Parents Using Web To Locate A Surrogate Mom, BOSTON GLOBE, June 1, 1998 (Zuchowski Aff., Ex. 22); *Ask Your Mother*, BOSTON GLOBE, June 11, 1995 (Zuchowski Aff., Ex. 23); *see also* Beverly Beckham, *Op-Ed, Still Learning From DES Flaws*, BOSTON HERALD, Jan. 17, 1996 (Zuchowski Aff., Ex. 24).

Moreover, information about the alleged injuries caused by *in utero* exposure to DES is widely available on the Internet through common search engines such as Yahoo! and Google. *See* Excerpts of Search Results concerning DES and infertility (Zuchowski Aff., Ex. 17). Information from DES Action, a support group for women exposed to DES, had information regarding causation available on the Internet as early as 1996. *See* list of archived Internet pages and search results from archived pages (Zuchowski Aff., Ex. 18). This site asserted, at least as early as April, 1999 that infertility was more frequent in "DES daughters" than in the population at large. *See* search results from archived pages of www.desaction.org (Zuchowski Aff., Ex. 18). By 1977, and thereafter, medical literature had also noted associations between DES exposure

and infertility. *See* Kaufman, *et al.*, "Upper Genital Tract Changes Associated with Exposure In Utero to Diethylstilbestrol," 128 *Am. J. Obstet. Gynecol.* 51 (May 1, 1977); *see also*, Search Results from www.pubmed.gov (Zuchowski Aff., Ex. 25).

In 1991, the Time Magazine cover story discussed DES exposure in the context of the possible causes of infertility. "Making Babies: More than a million couples seek treatment for infertility each year," September 30, 1991 at page 1-2 (Zuchowski Aff., Ex. 19). A 1991 USA Today article also mentioned DES exposure in connection with miscarriages and other reproductive difficulties. "Women, DES and Decades of Desolation," November 25, 1991 at page 1 (Zuchowski Aff., Ex. 20).

In short, Plaintiffs had a wealth of information available to them. Had they made any investigation, much less the reasonable and diligent investigation they were tasked with making under the District's discovery rule, they would have gained actual knowledge of a causal connection between their DES exposure and their infertility.

**C.     Prong 3:  Plaintiff Had A Duty To Investigate Whether Her Injuries Were The Result of Some Wrongdoing**

As stated above, Plaintiffs' duty to investigate extends to all three prongs of the District's discovery rule. *See Bussineau*, 518 A. 2d at 435. Thus, Plaintiffs also had a duty to investigate whether their injuries might have been the result of some wrongdoing. However, Plaintiffs maintain that they failed to take advantage of a multitude of resources including the Internet, national news media, and previous lawsuits against DES manufacturers. These resources would have provided Plaintiffs with actual notice of potential wrongdoing. Consequently, they should be charged with inquiry notice of the information a reasonable investigation would have revealed. *Diamond*, 680 A. 2d at 372.

1.     The District of Columbia Courts Hold Plaintiffs Accountable for Their Lack of Due Diligence.

It is well-established that the District of Columbia statute of limitations bars actions where the plaintiff did not act diligently after discovering at least some evidence of wrongdoing. *See Nelson v. American Nat'l Red Cross*, 815 F. Supp. 501, 503 (D.D.C. 1993), *aff'd in part, rev'd in part*, 26 F.3d 193 (D.C. Cir. 1994) (granting summary judgment against victim of HIV-tainted transfusion on statute of limitations grounds, despite the fact that plaintiff was never expressly told of wrongdoing); *Mattola v. Georgetown University Hospital*, 1992 WL 13198, *4-5 (D. D.C. 1992) (granting summary judgment on statute of limitations grounds because plaintiff was charged as a matter of law with knowledge of the wrongdoing evident in her medical records, even if she had not read them). Notice of wrongdoing and failure to act with due diligence has led a wide array of tort claims to be barred under the D.C. statute of limitations. *See, e.g., Stewart v. O'Malley*, No. Civ. A. 97-CV-184 (RM), 1998 WL 29499 (D.D.C. Jan. 21, 1998) (legal malpractice); *Reese v. Geneva Enters., Inc.*, No. Civ. A. 96-1575 (LFO), 1997 WL 214864 (D.D.C. Apr. 18, 1997) (emotional distress and fraudulent misrepresentation); *Burda v. National Ass'n of Postal Supervisors*, 592 F. Supp. 273 (D.D.C. 1984); *Cevenini v. Archbishop of Washington*, 707 A.2d 768 (D.C. 1998) (negligent hiring, fraud, emotional distress); *Allen v. Hill*, 626 A.2d 875 (D.C. 1993) (medical malpractice).

In the DES context, courts applying District of Columbia law have not shied away from barring claims brought by plaintiffs who fail to conduct a reasonably diligent investigation. In *Albers v. Eli Lilly and Company*, the Seventh Circuit held under the District of Columbia discovery rule that the absence of actual knowledge of tortious conduct by Lilly did not prolong the accrual period, because the plaintiff, *by objective standards*, was on notice to investigate her claim. 354 F.3d 644, 645 (7th Cir. 2004) (per curium). The court stated that "a reasonable person would have commenced an inquiry [after learning of her injury and its cause] and swiftly

would have found some evidence of wrongdoing." *Id.* A reasonable inquiry would have disclosed the existence of literally thousands of DES claims and other facts that gave indications of tortious conduct. *See Albers v. Eli Lilly and Company*, 257 F.Supp. 2d 1147, 1151 (N.D. Ill. 2003). Knowledge of those facts, available on even modest inquiry, is attributable to plaintiff and, in *Albers*, required entry of judgment for defendant.

*Albers* was recently adopted by the District Court for the District of Columbia as an accurate application of the District's discovery rule. *Roberge v. Eli Lilly and Co.*, 03-CV-01008 (RCL), 2005 U.S. Dist. LEXIS 3956, *27-28 (D.D.C. Mar. 11, 2005). In *Roberge*, as here, plaintiff did not have actual knowledge of alleged wrongdoing, but rather had *access* to resources that would have provided such notice. *See Roberge*, 2005 U.S. Dist. LEXIS 3956, at *29-30 (barring plaintiff's DES claims because though she was stressed and upset over her inability to conceive, she failed to take advantage of the physicians at her disposal to investigate potential claims). Plaintiff's claims were barred in *Roberge*, because plaintiff "did nothing to find out more about DES." *Id.* at *30.

        2.    <u>Had Plaintiffs Made Reasonable and Diligent Investigations, They Would Have Known of Their Ability to Sue Prior to July, 2000.</u>

In spite of their duties to conduct reasonable investigations, Plaintiffs waited years to investigate a possible claims, despite ample opportunity to do so and a vast array of resources at their disposal. If Plaintiffs had pursued reasonable avenues of investigation that were open to them prior to July, 2000, there is no question that she could have, and would have, learned about DES lawsuits alleging infertility and related physical injuries; *i.e.*, she could easily have learned about alleged wrongdoing by DES manufacturers. *See Albers*, 257 F. Supp. 2d at 1151.

        a.    DES Litigation History.

Since the 1970's, individuals have filed suits against DES manufacturers alleging injuries similar to Plaintiff's. The first DES lawsuit, a multiple plaintiff case, was filed on September 17, 1974. *See Abel v. Eli Lilly & Co.*, 289 N.W.2d 20, 22 (Mich. Ct. App. 1979). In Massachusetts, where Plaintiffs have lived their entire lives, a putative class action was filed in 1976. *Payton v. Abbott Labs.*, 437 N.E.2d 171, 173 (Mass. 1982). Through the years, scores of DES cases have been filed throughout the country.[3]

> b.    DES News in the Popular Press and on the Internet.

Once the first DES lawsuit was filed in 1974, there was widespread publicity in the popular press about DES and the lawsuits against DES manufacturers. *See, e.g.*, Indices of Popular Literature (Zuchowski Aff., Ex. 26); Westlaw search of Massachusetts media sources concerning diethylstilbestrol (Zuchowski Aff., Ex. 27). As example only, the Boston Globe published a story in 1994 about a group of women that were awarded $42.3 million due to cancer and reproductive problems allegedly related to DES. 11 Get $42.3M In DES Lawsuit, BOSTON GLOBE, January 9, 1994 (Zuchowski Aff., Ex. 28). The Boston Herald newspaper reported the same information. News In Brief, *DES Women Awarded $42.3M*, BOSTON HERALD, Jan. 9, 1994

---

[3]    The following is a partial listing of reported decisions – many of them involving claims for infertility or reproductive anomalies – issued in DES litigation. *See, e.g.*: *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426 (6th Cir. 1997) (Ohio); *Wood v. Eli Lilly & Co.*, 38 F.3d 510 (10th Cir. 1994) (Okla.); *Castrignano v. E.R. Squibb & Sons, Inc.*, 900 F.2d 455 (1st Cir. 1990) (R.I.); *Krist v. Eli Lilly & Co.*, 897 F.2d 293 (7th Cir. 1990) (Wis.); *Hofherr v. Dart Indus., Inc.*, 853 F.2d 259 (4th Cir. 1988) (Md.); *Glater v. Eli Lilly & Co.*, 744 F.2d 213 (1st Cir. 1984) (N.H.); *McElhaney v. Eli Lilly & Co.*, 739 F.2d 340 (8th Cir. 1984) (S.D.); *Mathis v. Eli Lilly & Co.*, 719 F.2d 134 (6th Cir. 1983) (Tenn.); *Renfroe v. Eli Lilly & Co.*, 686 F.2d 642 (8th Cir. 1982) (Mo.); *O'Brien v. Eli Lilly & Co.*, 668 F.2d 704 (3d Cir. 1981) (Pa.); *Narum v. Eli Lilly & Co.*, 914 F. Supp. 317 (D. Minn. 1996); *Holder v. Eli Lilly & Co.*, 708 F. Supp. 672 (E.D. Pa. 1989); *Lester v. Eli Lilly & Co.*, 698 F. Supp. 843 (D. Kan. 1988); *Brown v. Eli Lilly & Co.*, 690 F. Supp. 857 (D. Neb. 1988); *Webber v. Eli Lilly & Co.*, 117 F.R.D. 490 (D. Me. 1987); *Burel v. Berlex Labs., Inc.*, No. C84-1624A, 1986 WL 30018 (N.D. Ga. Oct. 8, 1986); *Schneider v. Eli Lilly & Co.*, 556 F. Supp. 809 (E.D. La. 1983); *Tidler v. Eli Lilly & Co.*, 95 F.R.D. 332 (D.D.C. 1982); *Gray v. United States*, 445 F. Supp. 337 (S.D. Tex. 1978); *Sutowski v. Eli Lilly & Co.*, 696 N.E.2d 187 (Ohio 1998); *Conley v. Boyle Drug Co.*, 570 So. 2d 275 (Fla. 1990); *Smith v. Eli Lilly & Co.*, 560 N.E.2d 324 (Ill. 1990); *Loerch v. Eli Lilly & Co.*, 445 N.W.2d 560 (Minn. 1989); *Mulcahy v. Eli Lilly & Co.*, 386 N.W.2d 67 (Iowa 1986); *Cavanaugh v. Abbott Labs.*, 496 A. 2d 154 (Vt. 1985); *Collins v. Eli Lilly & Co.*, 342 N.W.2d 37 (Wisc. 1984); *Martin v. Abbott Labs.*, 689 P.2d 368 (Wash. 1984); *Zaffi v. Eli Lilly & Co.*, 676 S.W.2d 241 (Mo. 1984); *Sindell v. Abbott Labs.*, 607 P.2d 924 (Cal. 1980).

(Zuchowski Aff., Ex. 29). At least as early as April, 1999, DES Action, a support group for women exposed to DES, reported on DES litigation and provided attorney referrals for DES-exposed women. *See* search results from archived pages of www.desaction.org (Zuchowski Aff., Ex. 18).

## CONCLUSION

In sum, the crucial knowledge of 1) the alleged causal connection between DES exposure and infertility, and 2) wrongdoing on the part of DES manufacturers was knowable to Plaintiff well before July, 2000 and could easily have been obtained through the simplest effort, much less by reasonable diligence. Where a reasonable investigation would have led to actual knowledge, Plaintiffs must be charged with inquiry notice. *Diamond*, 680 A. 2d at 372. Their unreasonable failure to investigate the possibility of causation and wrongdoing in a timely manner should bar their claims now.

Respectfully submitted,

ELI LILLY AND COMPANY
by its attorneys

/s/ James J. Dillon
James J. Dillon, D.C. Bar No. 485593
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210-2600
(617) 832-1000

Dated: October 27, 2006